```
 1

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    ------------------------------- x

 5    JAMES BONOMO,                   )

 6                                    ) NO.

 7          Plaintiff,                ) 07 CV 5967

 8       -vs-                         )

 9    MITSUBISHI INTERNATIONAL        )

10    CORPORATION,                    )

11                                    )

12          Defendants.               )

13    ------------------------------- x

14                 May 13, 2008

15                 9:30 a.m.

16

17          Deposition of RICHARD LOVELL,

18    held at the offices of Liddle &

19    Robinson, LLP, 800 Third Avenue, New

20    York, New York, pursuant to Notice and

21    Agreement, before Hope Menaker, a

22    Shorthand Reporter and Notary Public of

23    the State of New York.

24

25
```

26

- RICHARD LOVELL -

A. Well, if you're being harassed then you report it, regardless of what the reason is.

Q. I see. In this we're talking about equal employment opportunities --

A. Uh-huh.

Q. -- not harassment. You notice that, right? This is a different section than the harassment section.

A. Right.

Q. And did you know Mr. Bonomo when he worked at Mitsubishi?

A. Yes.

Q. In your observation, was he the kind of employee who would read these kinds of manuals and take them seriously?

A. I can't respond to that.

MR. SONNENBERG: Objection as to form.

Q. You made sure that he received his different manuals, correct?

27

- RICHARD LOVELL -

A. We make sure that the people receive them.

Q. Did you have any understanding of whether or not he read them?

A. He signed for the handbook. I'd have to assume that he read it.

Q. Same thing with this new code. Was this sent out with a page to sign?

A. I don't recall.

Q. Do you have in your possession, or perhaps something that either we have received and overlooked or that exists within the company, which was distributed but wasn't produced? Anything that refers explicitly to sexual orientation prior to the April 2nd or April 1st document here --

MR. SONNENBERG: Objection as to form.

Q. -- 13?

A. You're asking me whether there was anything that listed sexual

28

- RICHARD LOVELL -

orientation deliberately?

Q. Yes.

A. I don't believe so.

Q. How many days elapsed between the distribution date on the memo, April 2nd, 2007, and the date Mr. Bonomo first complained to you about sexual orientation discrimination?

A. He never complained to me.

Q. You didn't receive the draft complaint?

A. I received a draft complaint, yes.

Q. The draft complaint contained several causes of action alleging discrimination and harassment based upon sexual orientation, correct?

A. It did.

Q. So that was how many days?

A. We probably got the complaint physically somewhere around the 13th, I think.

Q. Approximately 10 days?

A. Yes, about.

29

- RICHARD LOVELL -

Q. Now, when they were putting out this new code of business conduct, were there discussions that involved yourself, sir?

A. I read through it, but there weren't discussions. It was something that Mitsubishi Corporation was going to distribute to all branches and subsidiaries.

Q. Did you play any role in writing up any of these handbooks, or was that done away from you locally or somewhere else?

A. The code of conduct was done in Tokyo.

Q. How about these other documents?

A. All the other policies, I played a role in writing them, and the handbook, I played a role in writing them, or somebody in my department did.

Q. Would there be somebody in a legal capacity who also played a role in writing them?

Page 46

- RICHARD LOVELL -

2  A. No.
3  Q. Our best information is that
4  this document is Mr. Leffler's notes
5  from the first meeting with Mr. Furuichi.
6  See the date, April 23rd, 2007?
7  A. Okay.
8  Q. Now, you took notes, but you
9  didn't think you took notes to the same
10 level as Mr. Leffler; is that correct?
11 A. Well, I never used Fred's
12 notes, frankly. What I did is, as I
13 went through, I jotted down words or
14 comments, and then either that night or
15 the following morning, I actually put
16 together the draft response. And the
17 draft response was my -- actually my
18 working papers.
19    MR. SONNENBERG: Objection as
20 to form.
21    MR. LIDDLE: Form of the
22 answer?
23    MR. SONNENBERG: No. Form of
24 the question.
25    You're just answering very

Page 47

- RICHARD LOVELL -

2  quickly. You need to give me a
3  little time to make an objection.
4     THE WITNESS: Sorry.
5  Q. My question was more of, I
6  guess sometimes a lawyer kind of
7  question, because after you go to law
8  school, you feel like if you're a
9  professional anything, it's
10 professional note-taker.
11    (Whereupon, Lovell Exhibit 28 was
12 premarked for identification.)
13 Q. If you take a look at the
14 first page of what I've just handed
15 you, which is Plaintiff's premarked
16 Exhibit 28, and you write to
17 Mr. Leffler on April 24th, "I did not
18 take notes like you did, but I am
19 writing a narrative of the conversation
20 with Furuichi which I will send later."
21    See that?
22 A. Uh-huh. Yes.
23 Q. Attached is something. Can
24 you -- is that the same document, the
25 next two pages, that we previously

Page 48

- RICHARD LOVELL -

2  looked at?
3  A. Looks to be, yes.
4  Q. Then after that investigation
5  on the Bonomo complaint, the
6  typewritten document, whose hand -- who
7  prepared that? Do you know?
8  A. That's mine.
9  Q. Okay. So you say, "Attached
10 are the handwritten and typed
11 questions."
12    That's those two documents,
13 correct? That's what you had referred
14 to as an attachment?
15 A. Yes.
16 Q. Now, did you take any notes
17 at all of that first meeting with
18 Mr. Furuichi?
19 A. Yes.
20 Q. What did you do with those?
21 A. I didn't keep the handwritten
22 notes that I had. I had put it into
23 the typewritten and, to me, the
24 typewritten was the working document.
25 Q. Did you make any changes at

Page 49

- RICHARD LOVELL -

2  all between what you handwrote and what
3  you typed?
4  A. What I handwrote was
5  basically words that I jotted down.
6  They weren't -- there were full
7  sentences here and there but not much.
8  Q. So the process that you used
9  was to take your notes and -- after the
10 meeting was to write it up and try to
11 put it into -- more into full
12 sentences?
13 A. Actually, make a more
14 complete report, right.
15 Q. Did you do anything other
16 than utilize the one word or two words,
17 the notes that you had taken, to
18 refresh your recollection when you were
19 typing it up?
20 A. No, I didn't need to. I did
21 it soon after the interview. Like I
22 said, it was either going to be that
23 night or the next morning.
24 Q. Take a look at Mr. Leffler's
25 notes, several pages, and Bates number

110

- RICHARD LOVELL -
Q. Here you have, "Did you or Furuichi have a cell phone with you in the locker room?" is your first question.
Then you say, "Did anyone take or pretend to take Jim's picture while he was undressed?"
So did you ask both of those?
A. I know I asked the second one. I'm not sure if I asked the first one.
Q. You think his answer to the second one was he didn't have a cell phone with him?
A. No. I think his answer was that he did not pretend to take a picture, take a picture, or make a phone call.
Q. Did Mr. Yue Zhibo have a massage?
A. Yes. As far as I know. I mean, that's what he said he did.
Q. Did you ask him?
A. Yes.

111

- RICHARD LOVELL -
Q. Where did you ask him that?
A. Well, like I said, these --
Q. Where on these notes did you ask him?
A. These questions are not the sum total of all the questions. I used these questions as a routing for me; I don't use them as absolute. And there's questions that I ask that aren't there.
Q. So you tell us that this interview was conducted over the telephone?
A. Yes.
Q. I'm going to ask you if you recognize that handwriting.
A. No.
Q. Okay. I will give you what we've premarked as Exhibit 48.
(Whereupon, Lovell Exhibit 48 was premarked for identification.)
Q. I'm going to give you also what we premarked as Exhibit 47.
(Whereupon, Lovell Exhibit 47 was

112

- RICHARD LOVELL -
premarked for identification.)
Q. Exhibit 47, again, I believe to be Mr. Leffler's handwritten notes?
A. Uh-huh.
Q. Have you ever seen those before?
A. No. I have not seen any of notes that you're showing me that he wrote.
Q. His notes did not go into an investigatory file?
A. No.
Q. Did you keep an investigatory file?
A. Yes.
Q. What was contained in your investigatory file?
A. My questions, my typewritten notes, and my final reports.
Q. Now, you were sending a letter, a note, to Mr. Bonomo, telling him to preserve documents?
A. Yes.
Q. And you were destroying your

113

- RICHARD LOVELL -
handwritten notes?
A. I didn't consider those as documents.
Q. Well, what did you think they were?
A. Basically, scribble. What I thought was the end product, was the thing that I labeled "Draft Notes."
Q. Well, when you say "end product," is it your understanding that the only documents you're supposed to retain are end products?
A. Well, from my investigation, I was keeping the notes, not handwritten, the typed notes, the typed questions, the final reports.
Q. But you also have drafts that were typewritten, right?
A. You've got them.
Q. And so the only thing that you didn't keep was any handwritten drafts that is the actual contemporaneous notes that you took during these interviews?

Page 114

- RICHARD LOVELL -

1  
2  A. Until the final -- until the final interview with Furuichi San, I talked to Diane, and Diane asked if I had any handwritten notes. I told her that I didn't retain them.
7       She said, You should have.
8       The typewritten ones really represent the handwritten.
10      And she said, No. You should have kept it even though they were just scribbled words on a thing.
13      So I said okay.
14  Q. So it was sometime in May of 2007 or June of 2007 when you learned for the first time that those were documents that should have been kept?
18  A. It was probably early June.
19  Q. Well, you know that this document "Your Guide to MIC" talks about record retention, right?
22  A. That's correct.
23  Q. Does it say, can you throw away your handwritten notes if you type them up?

Page 115

- RICHARD LOVELL -

2  A. Doesn't say I can't either.
3  Q. Well, what do you think the point of the record retention is if you can destroy a document or throw it away and simply replace it with something else?
8  A. The record retention policy in there, as far as I know, is dealing with how long we have to retain records so we don't have files that are overflowing.
13  Q. How long is that, sir?
14  A. Depends on what the document is.
16  Q. Let's take your notes of interviews. Whether you believe the handwritten note or the typewritten note created from the handwritten note is the document, how long are you supposed to retain those?
22  A. In this case, until the case is settled.
24  Q. Are you aware of any document retention requirements under the

Page 116

- RICHARD LOVELL -

2  various employment statutes that are asserted to have been violated in this complaint?
5  A. Yes. We have them in the record retention. I can't recite them.
7  Q. You can't recite any?
8  A. Depends.
9  Q. You can't recite any retention requirement under the New York State Human Rights Law?
12  A. Offhand, no.
13  Q. How about under 42 U.S.C. 1981, federal statute prohibiting race discrimination? How long is the record retention requirement there?
17  A. It's listed in our document, so I have no idea offhand.
19  Q. How about the New York City Human Rights Law?
21  A. No. It's listed in our -- I mean, these things are in writing, so you don't commit them to memory.
24  Q. Aren't you the ultimate person responsible for the integrity of

Page 117

- RICHARD LOVELL -

2  the filing system in the human resources department?
4  A. Within HR, but legal is the one that promulgates the record retention.
7  Q. For you?
8  A. Yeah, yes.
9  Q. So if these handwritten notes of Mr. Leffler's had been given to you, would you have destroyed them?
12  A. I wouldn't have needed them.
13  Q. So you would have destroyed them?
15  A. If they were given to me?
16  Q. Yes.
17  A. Yes. I would have asked him why he gave them to me; I don't need them. The reason I circulated the draft copies of the interviews to Fred was so that Fred could decide -- or take a look at it and see whether there's anything omitted or misstated.
24      He never had any comments back on any of the interviews, so from

```
                                                      146
 1         - RICHARD LOVELL -
 2   notes?
 3      A.   I -- yeah, I reviewed the
 4   things that I had written. And I also
 5   reviewed the handwritten notes that
 6   were retained on the second interview
 7   with Furuichi San.
 8      Q.   So it would have been around
 9   this time, that is mid-May, that you
10   had your conversation with Ms. Knox
11   about retaining the handwritten notes?
12      A.   I have a feeling it was
13   pushing closer to the end of May.
14      Q.   Just -- did you review the
15   your notes on this Takahashi interview?
16      A.   The report that I wrote or
17   the what I would call the draft of the
18   interview, yes.
19      Q.   Yes. On that you indicate
20   that Mr. Inada was there.
21      A.   Okay.
22      Q.   So would that then be
23   accurate, that Mr. Inada was there? Do
24   you remember or not remember?
25      A.   I don't, because it's -- here
```

```
                                                      147
 1         - RICHARD LOVELL -
 2   it's accurate, but I don't remember him
 3   being there.
 4      Q.   Whenever you have that kind
 5   of a situation in this deposition, that
 6   is, where you remember something
 7   because you see it and all, you have to
 8   differentiate for me between relying on
 9   the notes and relying on your memory
10   actually being refreshed.
11      A.   Okay.
12      Q.   You understand that
13   distinction that you just made for us?
14      A.   Sure.
15      Q.   Have there been any other
16   situations where you've testified based
17   upon a document because you relied upon
18   the document being accurate, but that
19   you didn't really have your own
20   recollection?
21      A.   No, I don't think so.
22         MR. LIDDLE:  We'll go until
23   1:00 and then break for lunch.
24         MR. SONNENBERG:  Sure.
25      Q.   I want to hand you what we've
```

```
                                                      148
 1         - RICHARD LOVELL -
 2   premarked as Exhibit 53.
 3         (Whereupon, Lovell Exhibit 53 was
 4   premarked for identification.)
 5      Q.   Let me also hand you a
 6   document that I've marked as
 7   Plaintiff's Exhibit 53A.
 8         (Whereupon, Lovell Exhibit 53A was
 9   premarked for identification.)
10      Q.   While we're at it, I will
11   give you Exhibit 54.
12         (Whereupon, Lovell Exhibit 54 was
13   premarked for identification.)
14      Q.   So 53 and 54 are, you're
15   sending around a proposed letter to
16   Mr. Bonomo in which you are writing to
17   talk about your disappointment about
18   the cancellation of a meeting, correct?
19      A.   Uh-huh. Yes.
20      Q.   You send that proposed letter
21   to Mr. Leffler and Mr. Inada,
22   Mr. Brumm; is that right?
23      A.   I see Jim's response back and
24   I see Diane's response back.
25      Q.   If you look at the foot of
```

```
                                                      149
 1         - RICHARD LOVELL -
 2   Page 2053, at the top of Page 3 I think
 3   you see those three, and they're also
 4   to Ms. Knox.
 5      A.   I don't think I got a
 6   response back from Inada.
 7      Q.   And Mr. Brumm was -- says
 8   he's fine with your e-mail. Ms. Knox
 9   says, "This time it's not just nice,
10   it's great."
11         And 53A is final version of
12   what you actually sent; is that
13   correct?
14      A.   Yes.
15         MR. SONNENBERG:  Objection as
16   to form. Compound.
17      Q.   You can answer it. It's
18   objection as to form. All right.
19         So, now, was there a reason
20   that, after having received that e-mail
21   from Mr. Bonomo earlier, asking you to
22   communicate with his counsel, that you
23   decided to deliver this particular
24   message directly to Mr. Bonomo?
25      A.   Jim was still our employee.
```

**Page 198**

- RICHARD LOVELL -

him about 11, he says that that paragraph is accurate. Correct?
 A. Yes.
 Q. Okay. Paragraph 12, now, this paragraph reads that "After dinner, at approximately 11, Mr. Zhang took everyone to a karaoke bar and nightclub. And before they left the restaurant, Mr. Furuichi stated to Mr. Bonomo 'You'll be the target tonight.'" Right?
 A. That's what the allegation says, correct.
 Q. Okay. Now, after an interview in April, all these other interviews, investigation going on for some time, Mr. Furuichi says, "May have gone," correct.
 That's "may have gone" to the karaoke bar?
 A. Yes. He's still not recalling.
 Q. "Not sure if not or not. Every selected by Anne side," meaning

**Page 199**

- RICHARD LOVELL -

every place they went was something that Anne said they wanted to do?
 A. Yes. As I understand, it was basically Mr. Zhang was the host and he made the arrangements.
 Q. "He may have said, 'you'll be target.'"
 That would be to Mr. Bonomo, right?
 A. That's correct.
 Q. And he said that would have meant drinking, and you put in quotes, "you are target before dinner," meaning drinking, but he does not remember specifically; is that --
 A. That's correct.
 Q. Is that him saying, I do not remember it, or you using the "does" in the third person, he does not remember it?
 If Mr. Furuichi had said it, he would have said, I do not remember, right? It wouldn't be -- it would be "do" instead of "does"; is that right?

**Page 200**

- RICHARD LOVELL -

 MR. SONNENBERG: Objection as to form.
 A. I can't -- again, you're looking at the notes that are being written contemporaneously with him speaking, so I can't respond well to verb tense.
 But what this comes down to in this case is that he does not remember that comment being made.
 Q. Later on, when this draft becomes a complaint, when the first amended complaint is filed, this Paragraph 12 survives as it's written here in those two complaints, correct?
 A. In your complaints?
 Q. Yes.
 A. I guess so. I don't remember.
 Q. Are you aware that in the answer that Mitsubishi denies all of the allegations of Paragraph 12?
 A. Yeah. That wouldn't surprise me.

**Page 201**

- RICHARD LOVELL -

 Q. Here, what you got from Furuichi is that he's not sure; isn't that right?
 A. No. He ended up saying, because you're going to see another line as you go forward, he began to build hypotheticals around things that could have happened, but when pressed, he basically said that there was no way that those things occurred. He did not recall them.
 Q. I see. Well, he did not recall -- I think we went through this before -- "did not recall" and "did not happen," in your mind, are two distinctly separate --
 A. No. I think you asked me about "denied" versus "did not recall." I think if somebody doesn't remember something, and they consistently don't remember, that's it; they don't remember it.
 Q. Okay. That's not a denial, correct?

214

- RICHARD LOVELL -
2  to form.
3    A.  I don't think that ever came
4  up.
5    Q.  It came up in this interview.
6    A.  Well, you didn't ask me and I
7  didn't say that no one knew he was
8  Italian.
9    Q.  Mitsubishi International
10 Corporation said so when they finally
11 answered the complaint?
12   A.  You'll have to ask the people
13 who finally answered the complaint.
14   Q.  Do you know who that was?
15   A.  No.
16   Q.  These notes -- were these
17 notes of Mr. Leffler's as well your
18 notes in the investigatory file?
19   A.  I don't know where Fred's
20 were.  I've never seen them.
21   Q.  Yours were?
22   A.  Yes.
23   Q.  Did you give that to the
24 attorneys for Mitsubishi International
25 Corporation after the litigation

215

- RICHARD LOVELL -
2  started?
3    A.  Yeah, after.  They asked for
4  them.
5    Q.  Was this investigation
6  supposedly an independent or neutral
7  investigation to try to get to the
8  truth of what took place here?
9    A.  It wasn't.  It wasn't
10 supposedly independent, it was.
11   Q.  Again, the only reason that
12 you turned this over to the attorneys
13 for Mitsubishi in the litigation was
14 what again?  They asked for it?
15   A.  Diane asked for it.
16   Q.  I see.  On 18, the paragraph
17 is, "After Mr. Bonomo had fully
18 undressed, Mr. Zhibo grabbed
19 Mr. Bonomo's bicep and made a comment
20 about his 'big muscles.'"
21        He says -- this is Leffler --
22 he says, "Mr. Yue may have commented
23 that JB had big muscles.  I never
24 touched JB and don't recall if Yue
25 touched him.  As a custom Japanese do

216

- RICHARD LOVELL -
2  not engage in physical exhibition or
3  touching.  Mr. Yue is a bit more
4  intimate with his friends."
5        You say, "Yue commented not
6  grabbed.  Pretty sure he did not touch.
7  Does not like to touch.  Yue is more
8  touch."
9        So how did you reconcile "not
10 grabbed" with "Yue is more touch," and
11 "Mr. Yue is more intimate with his
12 friends, and not recalling if Yue
13 touched him"?
14   A.  You'll see in the final
15 report that that was brought up as one
16 of the situations where both of them
17 believed that a comment was made about
18 his fitness, but they attributed the
19 comment to each other.
20       The -- also, the idea of
21 touching, they thought that maybe there
22 was touching on the bicep, but neither
23 of them admitted that they were the
24 one.  Each thought the other person had
25 done that.

217

- RICHARD LOVELL -
2        So that was the one thing
3  that was brought up by both of them as
4  something that could have happened, and
5  so I listed it as something that
6  potentially happened.
7    Q.  Were you aware that
8  Mitsubishi International Corporation
9  denied the allegations of Paragraph 18?
10   A.  No.
11   Q.  Paragraph 19 says, "Mr. Zhibo
12 then used his cell phone to take a
13 picture of Mr. Bonomo's genitals."
14       And Furuichi says, according
15 to your notes, "Does not remember.
16 Mr. Yue may have cell phone.  Do not
17 remember.  Yue could have taken
18 picture.  Prone to act like child."
19       Is that pretty much what
20 Mr. Furuichi told you?
21   A.  At that point, yes.
22   Q.  Mr. Leffler writes down, "I
23 don't remember if Yue took a picture
24 with cell phone.  Chinese do take cell
25 phones every place."

55 (Pages 214 to 217)

222

- RICHARD LOVELL -

 2   Q.  Mr. Leffler says, "I could
 3  have said this or Mr. Yue said this. I
 4  do not recall saying something like
 5  this, however."
 6       That's not "not at all," is
 7  it?
 8   A.  I didn't write Leffler's
 9  notes.
10   Q.  No, you didn't. But do you
11  think that what I've just read to you
12  from Mr. Leffler's notes makes up that
13  he doesn't recall rather than not at
14  all, and says that Mr. Yue could have
15  said this?
16       MR. SONNENBERG: Objection as
17   to form.
18   A.  No. I can only go by what I
19  wrote, and what I wrote is what I
20  recollect, and that's what went in the
21  report.
22   Q.  This is one of those things
23  where seeing the document or seeing
24  Mr. Leffler's notes doesn't refresh
25  your recollection. You believe that

223

- RICHARD LOVELL -

 2  what's in the document that you wrote
 3  is correct because it's a document that
 4  you prepared; is that right?
 5   A.  I believe that what I put in
 6  the document is accurate, yes.
 7   Q.  And me asking you questions
 8  about that or about a contradictory
 9  entry in Mr. Leffler's notes doesn't
10  refresh your recollection at all?
11   A.  I don't see what Fred has in
12  there as contradictory to her. I see
13  them shades of the same thing.
14   Q.  Did you ever ask Mr. Zhibo to
15  look at this claim and to answer
16  whether or not he said that?
17   A.  I did not.
18   Q.  Paragraph 24, since the
19  incident, Mr. Bonomo has avoided
20  traveling with Messrs. Furuichi and
21  Zhibo." You wrote down, "Jim/Furuichi
22  went to F-L-A"?
23   A.  Florida.
24   Q.  Florida? You think they went
25  on business trips to Florida together?

224

- RICHARD LOVELL -

 2   A.  Several times, according to
 3  that. I think there's a customer down
 4  there called Eastern Ribbon, or
 5  something Ribbon, and there was a
 6  problem with credit, I believe, with
 7  them.
 8       And I think they went a
 9  couple of times to them not listed
10  here, but I think they also went to
11  Germany once, possibly twice.
12   Q.  Are you aware that
13  Mr. Bonomo's testimony was that there
14  were quite a few people in Germany, and
15  both he and Mr. Furuichi were there,
16  but other than that, they had not
17  traveled together since this time?
18   A.  I'm not aware of what he
19  said.
20   Q.  Were you aware that what
21  Mr. Leffler heard, or at least what he
22  wrote down in respect of this
23  allegation, is dramatically different
24  from what you wrote down?
25   A.  What did he write down?

225

- RICHARD LOVELL -

 2   Q.  Well, he wrote down, "After
 3  China, I traveled one time with JB, I
 4  think to Florida."
 5       And you said, "went to
 6  Florida several times. I have not met
 7  with JB on trips. Everything OK with
 8  JB. No complaints re China. Jim now
 9  leaves office at 5 or 5:30 because he
10  commutes to Long Island.
11       "Between 2005 and 2007 there
12  was no change in JB business
13  relationship or traveling with me.
14  After China trip, JB sent e-mail to
15  Yue, thanking him."
16       Now, the commuting to Long
17  Island, leaving the office at 5 or
18  5:30, that was an indication that when
19  Furuichi was in the office in New York
20  and -- Mr. Bonomo did not go to dinner
21  with him even; isn't that correct?
22   A.  I have no idea.
23   Q.  You didn't hear any of these
24  things that Mr. Leffler wrote down?
25   A.  No.

57 (Pages 222 to 225)