RICHARD LOVELL
06/20/2007 02:27 PM

| | | |
|---|---|---|
| To: | YASUYUKI SUGIURA/JP/MITSUBISHI CORP@MITSUBISHI CORP | NYC/ACT |
| | HITOSHI INADA/JP/MITSUBISHI CORP@MITSUBISHI CORP | NYC/LGD |
| cc: | JAMES BRUMM/AM/MITSUBISHI CORP@MITSUBISHI CORP | NYC/EXE |
| | DIANE KNOX/AM/MITSUBISHI CORP@MITSUBISHI CORP | NYC/LGD |

Subject: Investigation - final report

Attached is the final report covering the investigation I did on the draft complaint sent to us by Jim Bonomo's lawyer.

If you have any questions please let me know


Investigative report.do

Regards

Rich

Richard B. Lovell
SVP, Human Resources Director
Mitsubishi International Corporation
655 Third Avenue
New York, NY 10017
212 - 605-2034
richard.lovell@mitsubishicorp.com

PLAINTIFF'S EXHIBIT 76

Privileged and Confidential

June 12, 2007

TO  Mr. Sugiura, SVP, CFO & CIO
       Mr. Inada, V.P./Secretary, Chief Compliance Officer

FROM   Richard B. Lovell, SVP, Human Resources Director

SUBJECT   Investigation Report

Investigative Findings

**Complaint** – On April 11, 2007 a draft complaint was sent from Attorney Jeffrey Liddle to Mr. Inada, MIC Legal, on behalf of his client Mr. James Bonomo in which he is claiming discrimination on account of Mr. Bonomo's race, national origin and sexual orientation. In the draft complaint Mr. Bonomo alleges violations of federal, state and city law, based on a single alleged incident, which occurred two years ago. The receipt of the draft complaint, two years after the alleged incident, is the first notification to MIC management that a potential problem existed.

More specifically, the draft complaint alleges that during a business trip to China in April 2005, Mr. Bonomo was subjected to harassment, which was "offensive" and "severe" and created an environment that was "hostile and abusive". Mr. Bonomo claims that after a business dinner, he went, reluctantly, to a bathhouse for a massage with Mr. Furuichi and Mr. Yue, both MC employees and Mr. Zhang a customer. In the locker room while undressing for the massage, Mr. Bonomo claims comments were made by Mr. Yue and Furuichi san about the size of his penis, referring to it as an "Italian sausage". He also claims that comments were made about his biceps and Mr. Yue grabbed his arm making a comment about big muscles. Then, at some point, Mr. Yue allegedly took a cell phone and took a picture of Mr. Bonomo with no clothes on, refusing to delete it when asked.

Allegedly, this harassment occurred based on his race, national origin and sexual orientation. In addition, as a consequence of this alleged harassment, retaliatory and discriminatory actions are alleged to have taken place which have altered Mr. Bonomo's terms and conditions of employment and consequently affected his career advancement and deprived him of compensation.

**Background information** - Mr. Bonomo is a Sales Manager employed in the General Merchandise Department of the Living Essentials Group. He joined MIC on June 14, 1999 as Manager, Paper Sales. As Sales Manager, Mr. Bonomo has responsibility for

directing the staff that helps support his business, but he does not have managerial or supervisory authority over them. The title is more for market presence and is descriptive of his functional management responsibilities of selling paper products in the US.

Throughout his career at MIC, Mr. Bonomo has worked for 4 different SVPs – 3 directly who also served as GMD Department Managers. During this time, he has received performance appraisals indicating that he is meeting management expectations, which means he is considered to be doing a good job overall in his sales position. So far, he has been to two developmental seminars: the Global Leadership seminar in Tokyo and this past fall, the Decision Making Seminar held by MIC. Moreover, he has attended the Civil Treatment seminar and the Performance Coaching seminar. The day he started with MIC, Mr. Bonomo attended an orientation session and was provided policies covering harassment and intimidation as well as an employee handbook (Your Guide To MIC) for which he signed. The handbook covers key policies and specifies the responsibility that all employees have to report wrongful acts. Additionally, in 2006, MIC set up and announced via e-mail and bulletin board that a Hot Line was established for employees to report via phone or the Internet any policy violations or illegal acts including harassment and discrimination. Reports may be made anonymously. The policies given to Mr. Bonomo as well as the Hot Line announcement stress that no retaliation will occur if an employee makes a report.

Mr. Furuichi, employed by MC since 1986, participated in hiring Mr. Bonomo when he was the Department Manager of MIC GMD in 1999. About 2 months after hiring Mr. Bonomo, Mr. Furuichi transferred back to MC and assumed the role of Manager of World Wide Paper Sales. As such he has responsibility for the profit generated by communication paper products throughout the MC organization, including MIC. He does not control the specific activities on the day-to-day basis of any staff outside of Tokyo; however, he is responsible to ensure his product is getting adequate attention from all employees involved in selling and marketing the product worldwide.

**Investigation** – My investigation was conducted pursuant to MIC policies, which prohibit discrimination, harassment and retaliation taken against MIC employees in the course of employment here. The goal of our internal investigation is to find out if the events alleged to have occurred in China actually took place as claimed by Mr. Bonomo. Secondly, I wanted to determine what influence those who allegedly harassed him had over decisions (either directly or by influencing others) that affected his career and/or compensation. Since the allegations have two parts, events that allegedly occurred in China and alleged retaliation/discrimination actions that affected Mr. Bonomo's career and compensation, each will be examined separately in this report.

In conducting the investigation on the China allegations, I interviewed Mr. Furuichi twice; once at the start of the investigation and again at the end to verify responses and clarify points. I interviewed Mr. Yue of MC China once by phone with the assistance of an interpreter. With regard to the retaliatory/discriminatory aspects of the claim, I interviewed Mr. Torao, MIC acting DDM for GMD, Mr. Takahashi the SVP for LEG and GMD Department Manager and Mr. Furuichi's interviews covered these aspect as well.

I also looked at e-mails between Mr. Bonomo and others to get any information relevant to the allegations, as well as get a sense of the tone and cooperation between the parties.

Unfortunately, Mr. Bonomo through his lawyers has refused to participate in the investigation. Other than the allegations in his draft complaint, I have no statements from him, no evidence to substantiate his claim and no information from witnesses that support his allegations.

**China Allegations** – The MC employees involved in the events that supposedly happened during a night of entertainment while on a business trip to China are Mr. Tetsuya Furuichi of MC Japan and Mr. Yue Zhibo of MC China.

<u>Interview with Mr. Furuichi</u> - In the initial interview Mr. Furuichi did not see the complaint. I questioned him about the China trip, obtained some background information, asked about his managerial responsibilities, as well as about his professional and personal relationship with Mr. Bonomo. For purposes of this report, some information is combined from the two interviews, except the part of the second interview where he was specifically asked about the items in the draft complaint point by point.

The China trip came about as a result of an earlier meeting in 2004 in London where Mr. Zhang, President of Anne Paper, Mr. Yue and Mr. Bonomo discussed increasing business with China. In April of 2005, Mr. Furuichi arranged a trip to China and asked Mr. Karns, a new Sales Manager in Germany and Mr. Bonomo to attend. Initially Mr. Bonomo, Mr. Karns and Mr. Furuichi met in Tokyo. Mr. Bonomo arrived on a Sunday night and they spent two days together visiting customers and attending meetings with MC staff.

On Wednesday, Mr. Bonomo and Mr. Furuichi left for China where they met Mr. Yue (Mr. Karns met another customer). After touring the Anne paper factory, Mr. Zhang took his guests – Mr. Bonomo, Mr. Yue and Mr. Furuichi out for entertainment. As is the custom in China, the host makes the arrangements. It is also the custom that a first time visitor to China is expected to drink a lot. Since this was Mr. Bonomo's first trip to China, drinking activities would customarily focus on him, although according to Mr. Furuichi, Mr. Zhang is less inclined to do that particularly with Westerners. Another point made by Furuichi san and Mr. Yue is that entertainment is very usual and activities tend to be redundant. Consequently, Mr. Furuichi remembers going to the restaurant but does not remember the name. He said that he did not recall any conversations directed at Mr. Bonomo that would have made him uncomfortable at the restaurant. Following the meal he did not recall if they went to the Karaoke Bar or not. When asked about drinking at the restaurant he said he drank heavily but was not drunk, i.e. slurring words, etc. He said that Mr. Bonomo drank some beer or wine he thinks but did not drink much.

He said that after the restaurant and Karaoke (if they went), they went to the bathhouse for a massage. Mr. Zhang drove to the bathhouse with Mr. Bonomo, Mr. Yue and Mr. Furuichi in his car. Mr. Furuichi does not recall any conversations with Mr. Bonomo either in the car or before about the massage that would have made Mr. Bonomo

uncomfortable nor does he recall Mr. Bonomo requesting to be taken back to the hotel. In fact he seems to remember that everyone was happy to go. (Going to a bathhouse is a very normal end to a night of entertainment). At the bathhouse, Mr. Furuichi, Mr. Bonomo and Mr. Yue went into the locker room to get changed; however, Mr. Zhang did not join then them. While changing, Mr. Furuichi remembers making a comment about Mr. Bonomo's fitness but does not remember anyone grabbing his bicep, although he thought it possible Mr. Yue may have done so. Furuichi san seemed put-off at the thought of touching another man in that setting. He also did not remember an incident with a cell phone nor any comments about Mr. Bonomo's penis. Again, he seemed genuinely put off by that subject. After changing, they took a shower and each went for the massage, meeting about an hour later to go back to the hotel. Returning to the hotel, Mr. Furuichi thinks that Mr. Yue, Mr. Bonomo and he took a taxi. He thinks Mr. Zhang had left earlier. On the way back to the hotel he recalls things being cordial.

The next day, Mr. Furuichi and Mr. Bonomo took a flight to the next customer where Mr. Karns joined them. There were several customer meetings and two nights of dinners but after dinner, Mr. Karns and Mr. Bonomo went back to the hotel. On Saturday Mr. Bonomo went sightseeing. Mr. Furuichi does not recall any comments by Mr. Bonomo about the bathhouse, complaints or otherwise.

After the trip, each went back to their normal routine. No issues or complaints were made by Mr. Bonomo to Furuichi san or anyone one else to Furuichi san's knowledge. After the China trip, Mr. Furuichi has had several occasions to meet with Mr. Bonomo, sometimes in NY, sometimes where they either traveled together or met at an off site location. In 2005 they went to Fla. together for a meeting with Eastern Ribbon; in June and in August they met in the NY office and in October met in Germany at a sales meeting. In 2006 they met in Germany, where they entertained some customers in January and again in September. At no time, in Furuichi san's recollection, did Mr. Bonomo seem reluctant to be with him nor did he say anything to indicate he had issues with the China trip. Additionally, I saw nothing in the e-mails I reviewed that suggested any change in their relationship.

I also asked Mr. Furuichi how well he knows Mr. Bonomo personally. He said he had been to his apartment when he lived in Manhattan but would describe their relationship more as business colleagues. He did not have knowledge of Mr. Bonomo's sexual orientation.

In the second interview with Mr. Furuichi I asked him to conversationally recap the trip to China. Basically the recap was very consistent with the information above. Following this discussion, I asked Mr. Furuichi specifically about the points in the draft complaint starting with Number 10 and ending with number 25

\# 10 will be covered in more detail below, as it is most relevant to alleged retaliation.

\# 11 - Accurate but Mr. Furuichi believes Mr. Zhang drove using his own car.

# 12 - Mr. Furuichi does not remember going to Karaoke. He also does not recall saying to Mr. Bonomo "you will be the target". As a hypothetical, if he did make such a statement, he believes it would have referred to the drinking and would have been said at the restaurant or before going to the restaurant. The reason, he explained, is that by custom a first time visitor to China is often encouraged to drink to the point of passing out. This was Jim's first visit but Mr. Furuichi had no recollection of some of the events as recounted by Mr. Bonomo in the draft complaint.

#13/#14 - Furuichi san does not recall the exact time but thinks it was about 11 PM or 12AM when they went to the bathhouse from the restaurant (or Karaoke). He does not recall any specific conversations including Mr. Bonomo being insistent on returning to the hotel. He thinks that if that had occurred, he would have taken Jim back to the hotel (actually the hotel was not far from the restaurant and bathhouse, etc. so dropping Mr. Bonomo off would not have been an issue).

#15 - He thinks this statement is false. He has no interest in seeing Mr. Bonomo undressed. In fact Mr. Furuichi seemed uncomfortable, and frankly repulsed, at this thought.

#16 – He does not have any recollection of this type of conversation.

#17 - He does not recall if Mr. Zhang went into the locker room or not. Mr. Zhang goes there frequently, so he may have been carrying on a conversation with the receptionist and did not immediately come in.

#18 – Furuichi san thinks Mr. Yue made the comment, but does not recall any touching. Although he said it is possible Mr. Yue grabbed his bicep, but really has no recollection of that occurring.

#19 - He does not remember anything to do with a cell phone or a picture.

#20 - Does not remember this happening but hypothetically if it did, Mr. Yue would have deleted it as soon as he knew that Mr. Bonomo was upset and Furuichi san would have insisted that he do so. However, he said he does not recall anything about a cell phone, or taking any pictures of Mr. Bonomo, nor of Mr. Bonomo objecting to anything at the bathhouse or even afterwards.

#21 - – Does not recall a statement like this. Again, he said, conversations about male genitals are not a topic he would bring up.

#22 – There was no indication at all that Mr. Bonomo was shocked and embarrassed either in the way he acted or anything he said as far as Furuichi san recalls.

#23 – This is accurate but he thinks Mr. Zhang may have left, leaving Mr. Yue, Mr. Bonomo and Furuichi san to get a taxi back to the hotel – but not sure.

#24 – There is no evidence of Mr. Bonomo's reluctance to travel with Mr. Furuichi after the China trip. Also, since no business has developed between China and MIC, the contact between Mr. Yue and Mr. Bonomo has been limited.

#25 – This point will be covered under the career allegations.

NOTE – In the second part of the second interview when Mr. Furuichi was looking at the allegations, he began raising hypotheticals around the comments Mr. Bonomo alleged in his draft complaint. Somewhere around point 21 I asked Mr. Furuichi whether he actually remembered these things or was taking guesses as to why something may have happened, if it happened. Bottom line, he has no specific recollection of any event occurring at the bathhouse to which Mr. Bonomo objected or voiced displeasure. He only recalls that they went to a bathhouse, they got a massage and everyone seemed fine. This lack of recollection is very consistent with the first interview and the first part of the second interview and his initial responses on the point by point in the draft complaint.

Interview with Mr. Yue - This interview was done on the telephone using an interpreter. Mr. Yue has been with MC China for 14 years and works with Mr. Furuichi in his capacity as having worldwide responsibility for paper sales. He said that typically Mr. Furuichi visits China 6 or 7 times a year. Mr. Yue said his interaction with Mr. Bonomo is limited. He mentioned once in Germany and the trip to China. He describes their relationship as professional, not personal.

I asked Mr. Yue many of the same questions I asked Furuichi san on the first interview. Like Furuichi san, Mr. Yue was having a problem figuring out why there was a need for an investigation. He said that after the business meeting at Anne, Mr. Zhang arranged for a night of entertainment. He does not recall the name of the restaurant and, like Furuichi san, does not remember if they went to karaoke or not. When asked about drinking, he said he does not remember it being heavy and thinks that Mr. Bonomo had some beer. Mr. Yue does not recall any conversations about Mr. Bonomo being a target of any conversations of a sexual nature when discussing the bathhouse. He does not recall any concerns Mr. Bonomo had about going to the bathhouse or any requests to return to the hotel before going to the bathhouse. He basically described the process at the bathhouse as: open locker area, undress, shower and a massage. Mr. Yue does not remember anything unusual happening in the locker area, use of cell phones, penis comments etc. He thinks Mr. Furuichi commented about Mr. Bonomo being in good physical condition. He does not recall an incident involving grabbing Mr. Bonomo's bicep. He does not recall anyone using a cell phone to take pictures in the locker room. After the bathhouse, Mr. Yue, Mr. Bonomo and Mr. Furuichi took a taxi back to the hotel. He does not recall Mr. Bonomo being concerned or upset on the way back to the hotel. Following the China trip Mr. Yue's contact with Mr. Bonomo is as it was before, limited.

Conclusion on the China allegations – In the absence of information from Mr. Bonomo and his failure to present any evidence to substantiate his claim, I have to go with the investigative information available to me. My conclusion is that there is insufficient evidence to support the claims made by Mr. Bonomo.

It is true that Mr. Yue and Mr. Furuichi could not remember a number of details, but my conclusion is that they did not find this night particularly memorable. Given the amount of entertaining both men are involved with in general and specifically together in China, it is not surprising to me that events all run together. Nothing they told me leads me to believe the allegations or policy violations occurred that are alleged in the draft complaint. Another problem is the investigation is taking place two years after the alleged behavior, which is not helpful to anyone's recall. A more timely complaint filing by Mr. Bonomo would have been a significant benefit in gathering and evaluating information. Could there have been some remarks passed as a kind of locker room humor? Possibly. Did it rise to the level claimed by Mr. Bonomo? All available evidence and information says it did not.

**Mr. Bonomo's Career/compensation** – As noted above, for this part of the allegations raised in the draft complaint I interviewed Mr. Furuichi, Mr. Takahashi and Mr. Torao. In the draft complaint, Mr. Bonomo is alleging that his career and compensation have been negatively impacted due to retaliatory and discriminatory actions being taken against him.

Interviews with Mr. Furuichi – Both interviews were very consistent on this subject. Mr. Furuichi directly managed Mr. Bonomo until July 31, 1999 (for about 2 months) when he was the Department Manager at MIC. After he terminated from MIC and went he back to MC as Manager, Communication Paper, he had responsibility on a worldwide basis for communications paper sales. He managed the product and the profit but not specifically any employees outside of MC Tokyo. He did not have any input into salary decisions and did not have any say in individual bonus payments or formulas. He also did not have any say in promotions of any staff. He had several occasions to speak to Torao san about issues he saw as impacting the business but more from the sense that Torao san needed to manage the staff in GMD more closely making sure they had specific plans when taking business trips, managing credit, receivables and developing new business. He also, on occasion, spoke to Mr. Bonomo about some areas that needed improvement. However, he did not manage the activities of staff, including Mr. Bonomo, from an authority perspective but did provide responsibility direction as part of his worldwide business management role. He was never asked by Mr. Takahashi or the prior SVP, Mr. Fuji, for input on performance appraisals, etc. Mr. Furuichi's assessment of Mr. Bonomo is that he is a good sales representative and does well with existing customers. He is not strong in business development. He also feels that since 2004, Mr. Bonomo's performance has fallen off some. He thinks that when he lived in Manhattan, he put more time in on the job. Since moving to LI he puts in less hours and this may impact his results. Although, I think Mr. Furuichi respects Mr. Bonomo and the rest of the staff in NY, I think he believes management needs to be stronger and more on top of things. He believes the staff in NY is aware of this and knows things will get closer attention if he is reassigned to MIC.

As noted above, Mr. Furuichi did not set individual bonus targets nor did he set individual formulas for payment. He did, however, work with each MC location,

including MIC, to set the sales and profit targets for the location as part of the overall target for the product(s) worldwide. Through various interviews, I learned that setting the GMD target was a "process". Mr. Torao discussed the target with Mr. Bonomo and presented their recommended sales target to MIC management as well as Tokyo management. From what I understand, within the confines of what was required to successfully manage the business, care was taken to try and ensure the targets were attainable. All of this seems to me to be very much standard business practice. Additionally, there is an e-mail from Mr. Bonomo to Mr. Furuichi dated July 2005 in which he is complaining about an inability for the GMD Department to reach the target but his issues are business related questions/concerns, not personal, like he is being singled out. While the e-mail is complaining, it reinforces that he understands that targets are business based and set for the Department, rather than set to retaliate against him.

Interview with Mr. Torao – Mr. Torao joined MC in April 1992 and transferred to MIC in September 2003. Within GMD, employees are matrixed reporting to both Mr. Bonomo and Mr. Torao as support for their business. Neither man is the actual manager of the staff. According to Mr. Torao, he and Mr. Bonomo are on the same level. However, the Group SVP, Mr. Takahashi, has asked Mr. Torao to act as his direct interface with the department staff on his behalf. As such, Mr. Torao completed the Performance Enhancement Form (appraisal) for Mr. Bonomo and met with him to discuss it. Both worked on the PEPs for the rest of GMD. Mr. Torao said he did not discuss salary or bonus payments with Bonomo. Mr. Torao did speak with Mr. Bonomo and Mr. Rice regarding the targets for GMD sales and profit and he more or less confirmed the process for setting targets described by Mr. Furuichi. According to Mr. Torao, in 2005, a year for which the bonus payment was not good and dropped significantly from the year before, MC actually requested that MIC lower the target. MC believed the target was too high. Mr. Sakurai, President of MIC at the time, was consulted and agreed. The significance is that there is a business process in place not an arbitrary punishing target being set for Mr. Bonomo.

Torao san said he was aware of the business trip to China but is unaware of any problems developing from it. He has not noticed any significant change in Mr. Bonomo's behavior except since April 2007. He believes he gets along well with Mr. Bonomo although he believes Mr. Bonomo was not happy to see him assigned to NY and believes Mr. Bonomo thinks it is blocking his promotion to Department Manager. His evaluation of Mr. Bonomo is he is a good sales person but does not invest the energy to develop new business. On occasion he has had to speak to Mr. Bonomo about some issues and "suggest" he take certain actions to conform to policy. There is some e-mail to this effect as well.

Torao san thinks that Mr. Furuichi also respects Mr. Bonomo's sales ability. Mr. Furuichi mentioned to Torao san that he is concerned that if he is reassigned to NY it might serve to de-motivate Mr. Bonomo and he wants to avoid that. At the same time, Furuichi san believes the staff at GMD needs to be managed closer. Over the years, between 1999 and now, Furuichi san has had some concerns about specific situations and complained about some aspects of Mr. Bonomo's performance and attitude. This was to

correct a problem, not for the purposes performance input. One final point is that when Mr. Torao told Mr. Bonomo in March that Mr. Furuichi was coming as Department Manager, he voiced no concern.

Mr. Torao does not have a personal relationship with Mr. Bonomo. They are business colleagues and go out on occasion with customers but seem not to get into personal subjects. I left the door open for him to comment about Mr. Bonomo's sexual orientation, but he did not.

Interview with Mr. Takahashi – Mr. Takahashi joined MC in 1973, coming to MIC in 2004 as SVP, Group Head for Living Essentials. From his arrival until his departure in March 2007, he also functioned as Department Manager for GMD. Given his broader responsibilities, he delegated the day-to-day departmental management to Mr. Torao. One of Torao san's responsibilities was to evaluate the staff and complete the PEPs. He would also recommend salary increases, which Mr. Takahashi would consider in his decision. He confirmed that Mr. Furuichi had no input on compensation decisions at MIC and no authority over MIC staff.

Mr. Takahashi confirmed that he had bonus discussions with Mr. Bonomo. He said Mr. Bonomo wanted to use his individual sales results for the bonus target as opposed to overall GMD results and Mr. Takahashi agreed that he and Ted Rice could do that. He also agreed to modify the incentive formula weighting so that 80% was based on individual performance as opposed to the usual 45% for P band employees. He said the targets were discussed by Torao san and Mr. Bonomo and presented to Mr. Takahashi for his acceptance. He said he wanted to be sure the gross profit numbers used (profit less interest and bad debt) were reasonable for the business and the staff.

I also asked Takahashi san if he had any discussions with Mr. Bonomo about his salary or promotional possibilities and he replied that there were none that he recalled. Mr. Takahashi felt that Mr. Bonomo's performance over the time that he was SVP was constant – did not get better or worse. While he thought Mr. Bonomo was a good sales person, he did not think he would be a good manager. He cited the problems that occurred with Robert as an example and the way Mr. Bonomo handled the situation as well as his overall relations with the staff of GMD.

Finally, I asked him about the trip Mr. Bonomo took to China. He was not aware or did not recall that trip but mentioned that Mr. Bonomo frequently went to Germany.

My conclusion, after speaking to Mr. Torao, Mr. Takahashi, and Furuichi san, is that no one negatively impacted Mr. Bonomo's career and/or compensation in a retaliatory or discriminatory manner. I find that Mr. Furuichi, as an MC employee, did not have managerial responsibility or authority for any staff at MIC. As manager for world wide communications paper sales he was responsible for setting overall direction and coordinating the efforts of sales staff world wide to ensure overall sales goals are accomplished. He had no input on compensation decisions at MIC that would impact Mr. Bonomo's base pay. Nor did he provide performance information to the SVP.

Additionally, I found that the sales targets for products Mr. Bonomo sold were set on a worldwide basis with each MC office and subsidiary, including MIC, getting a portion. Mr. Bonomo and Mr. Torao discussed the targets and care was taken to ensure the targets were reasonable both by MIC management as well as by Furuichi san. Also by agreement with the SVP, Mr. Bonomo was not judged on the GMD target but rather on his personal sales goals as he requested. This formula difference, as well as the weighting changes, are a departure from the typical plan and were made at Mr. Bonomo's request. Mr. Bonomo's target was related to the GMD target, but the target impacted all the Staff in GMD, not only Mr. Bonomo. Absent Mr. Bonomo's participation in the investigation and evidence to the contrary, I find no basis for retaliation. Because Mr. Bonomo failed to bring his complaint to anyone's attention prior to April of 2007, I do not see how retaliation could have been a motive as none of the people with whom I spoke or who could have impacted his bonus, salary, performance appraisals or working environment were aware of any discrimination complaints that Mr. Bonomo had made, as far as I know. In addition, I find no evidence of discrimination based on his being a gay, Italian male. While people knew of his Italian heritage, no one with whom I spoke knew that he is gay. In any event, whether known or not, I found no evidence to support Mr. Bonomo's contention that his Italian heritage or sexual orientation was used in any way as a basis for discrimination.